## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| STATE OF MICHIGAN, ) | |
| ) | Civil Action No. 1:15-cv-590 |
| NOTTAWASEPPI HURON BAND OF THE ) | |
| POTAWATOMI, ) | |
| ) | |
| And ) | Judge |
| ) | |
| MATCH-E-BE-NASH-SHE WISH BAND OF ) | |
| THE POTTAWATOMI INDIANS ) | |
| ) | |
| Plaintiff, ) | COMPLAINT |
| ) | |
| v. ) | |
| ) | |
| ENBRIDGE ENERGY, ) | |
| LIMITED PARTNERSHIP , ) | |
| ENBRIDGE PIPELINES (LAKEHEAD) L.L.C. ) | |
| ENBRIDGE ENERGY PARTNERS, L.P. ) | |
| ENBRIDGE ENERGY MANAGEMENT, L.L.C. ) | |
| ENBRIDGE ENERGY COMPANY, INC. ) | |
| ENBRIDGE EMPLOYEE SERVICES, INC. ) | |
| ENBRIDGE OPERATIONAL SERVICES, INC., ) | |
| and ) | |
| ENBRIDGE PIPELINES INC. ) | |
| ) | |
| Defendants. ) | |

# COMPLAINT

Plaintiffs, the United States of America, by the authority of the Attorney General

of the United States and through the undersigned attorneys, acting at the request of federal natural

resource trustees, including the United States Department of the Interior, through the United

States Fish and Wildlife Service and the Bureau of Indian Affairs ("BIA"), and the Department of

Commerce, through the National Oceanic and Atmospheric Administration, together with the State of Michigan, through State natural resource trustees, including the Michigan Department of Environmental Quality, the Michigan Department of Natural Resources, and the Michigan Attorney General, and with Tribal natural resource trustees, including the Nottawaseppi Huron Band of the Potawatomi and the Match-E-Be-Nash-She-Wish Band of the Pottawatomi Indians, file this Complaint and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought on behalf of federal, State and Tribal trustees pursuant to Section 1002 of the Oil Pollution Act, as amended ("OPA"), 33 U.S.C. § 2702, to recover damages from Defendants for injury to, destruction of, loss of, or loss of use of natural resources, resulting from discharges of oil from Defendants' Lakehead System Line 6B pipeline on July 25 and July 26, 2010 (the "Discharges") near Marshall, Michigan. Oil from Line 6B discharged onto the ground and into waters of the United States and the State of Michigan, including Talmadge Creek and the Kalamazoo River, and into or upon adjoining shorelines. In this action, Plaintiff State of Michigan also asserts claims under MCL 324.20126a for recovery of natural resource damages resulting from the Discharges. The natural resource damages sought by Plaintiffs in this action include reasonable costs incurred by federal and Tribal natural resource trustees in assessing the damages resulting from the Discharges.

## JURISDICTION, AUTHORITY, AND VENUE

2.      This Court has jurisdiction over Plaintiffs' claims under Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331 and 1345. This Court also has supplemental jurisdiction over the State of Michigan's claims under 28 U.S.C. § 1367(a).

3.       Authority to bring the United States' claims is vested in the United States Department of Justice by, *inter alia*, 28 U.S.C. §§ 516 and 519.

4.       Venue is proper in the Western District of Michigan under Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1391 and 1395, because the claims arose in this district and the Defendants are located and doing business in this district.

## DEFENDANTS

5.       The Defendants named in this action are Enbridge Energy, Limited Partnership, Enbridge Pipelines (Lakehead) L.L.C., Enbridge Energy Partners, L.P., Enbridge Energy Management, L.L.C., Enbridge Energy Company, Inc., Enbridge Employee Services, Inc., Enbridge Operational Services, Inc., and Enbridge Pipelines Inc.

6.       Enbridge Energy, Limited Partnership ("EELP"), which was formerly known as Lakehead Pipe Line Company, Limited Partnership, is a limited partnership organized in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EELP owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

7.       Enbridge Pipelines (Lakehead) L.L.C. ("EP-Lakehead") is incorporated in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EP-Lakehead was the managing general partner of EELP and, as such, it owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

3

8.      Enbridge Energy Partners, L.P. ("EEP") is organized in the State of Delaware and is believed to do business in the State of Michigan with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EEP owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

9.      Enbridge Energy Management, L.L.C. ("EEM") is organized in the State of Delaware and is believed to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EEM owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

10.     Enbridge Energy Company, Inc. ("EECI"), which was formerly known as Lakehead Pipe Line Company Inc., is organized in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EECI owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

11.     Enbridge Employee Services, Inc. ("EESI") is organized in the State of Delaware and registered to do business in the State of Michigan with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EESI owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

12.     Enbridge Operational Services, Inc. ("EOSI") is a Canadian corporation that is believed to do business in the State of Michigan with its principal office at 10201 Jasper

4

Avenue, Edmonton, Alberta, Canada T5J 2J9. At all times relevant to this action, EOSI owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

13. Enbridge Pipelines Inc. ("EPI"), which was formerly known as Interprovincial Pipe Line Limited, is a Canadian corporation and is believed to do business in the State of Michigan, with its principal office at 3000 Fifth Avenue Place, 425 1st Street, S.W., Calgary, Alberta, Canada T2P L38. At all times relevant to this action, EPI owned and/or operated Line 6B in conjunction with other Enbridge entities herein named as Defendants.

14. Each of the Defendants identified in Paragraphs 5 - 13, above, (collectively referred to herein as "Defendants" or "Enbridge") is a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27), and MCL 324.301(h), a "responsible party" within the meaning of Section 1001(32)(E) of OPA, 33 U.S.C. § 2701(32)(E), and a person liable under Section 20126 of the NREPA, MCL 324.20126 with respect to Line 6B.

## GENERAL ALLEGATIONS

### Section 1002 of the Oil Pollution Act

15. Section 1002(a) of OPA, 33 U.S.C. § 2702(a), provides:

Notwithstanding any other provision or rule of law . . . each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

16. For purposes of OPA, "facility" is defined in Section 1001(9) of OPA, 33 U.S.C. § 2701(9), as:

any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil. This term

5

includes any motor vehicle, rolling stock, or *pipeline* used for one or more of these purposes.

(Emphasis added.)

17.    For purposes of OPA, "oil" is defined in Section 1001(23) of OPA, 33 U.S.C. § 2701(23), to include:

oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil, but does not include any substance which is specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601) and which is subject to the provisions of that Act . . .

18.    For purposes of OPA, "discharge" is defined in Section 1001(7) of OPA, 33 U.S.C. § 2701(7), as "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping."

19.    For purposes of OPA, "navigable waters" is defined in Section 1001(21), 33 U.S.C. § 2701(21), as "the waters of the United States, including the territorial sea."

20.    In the case of a pipeline facility, "responsible party" is defined in Section 1001(32)(E) of OPA, 33 U.S.C. § 2701(32)(E), as "any person owning or operating the pipeline."

21.    Under Section 1002(b)(2)(A) of OPA, 33 U.S.C. § 2702(b)(2)(A), the damages for which a responsible party is liable under OPA include:

Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.

22.    Section 1001(20) of OPA, 33 U.S.C. § 2701(20), defines "natural resources" to include "land, fish, wildlife, biota, air, water, ground water, drinking water supplies,

and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States . . . , any State or local government or Indian tribe."

23.    Section 1004(a) of OPA, 33 U.S.C. § 2704(a), generally limits the liability of a responsible party to $350,000,000 per incident, in the case of incidents involving an onshore facility. However, pursuant to Section 1004(c) of OPA, 33 U.S.C. § 2704(c), this monetary limitation on liability is inapplicable in the case of incidents that were proximately caused by: (i) gross negligence or willful misconduct of the responsible party, its agents or employees, or other persons acting pursuant to a contractual relationship with the responsible party; or (ii) violation of an applicable Federal safety, construction, or operating regulation by the responsible party, its agents or employees, or other persons acting pursuant to a contractual relationship with the responsible party.

## Michigan Natural Resources and Environmental Policy Act

24.    Under the NREPA, a "facility" means any area, place, or property where a hazardous substance in excess of the concentrations that satisfy the cleanup criteria for unrestricted residential use has been released, deposited, disposed of, or otherwise come to be located. MCL 324.20101(s).

25.    The definition of "hazardous substance" under the NREPA includes petroleum and petroleum mixtures. MCL 324.20101(x), MCL 324.21303(g).

26.    Section 20101(m) of the NREPA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking or placing of any hazardous substance into or on any land or water so that the hazardous substance or any constituent of the hazardous substance may

7

enter the environment or be emitted into the air or discharged into any groundwater or surface air." MCL 324.20101(m).

27.     An owner or operator of a facility who is responsible for an activity causing a release or threat of release, or who is the owner or operator of a facility at the time of disposal of a hazardous substance, is liable under Part 201. MCL 324.20126(1).

28.     A person who is liable under Section 20126 of the NREPA is jointly and severally liable for, *inter alia*, "[d]amages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction or loss resulting from the release." MCL 324.20126a(1)(c).

29.     Liability for natural resource damages under Section 20126a(1)(c) "shall be to the state for natural resources belonging to, managed by, controlled by, appertaining to, or held in trust by the state or a local unit of government." MCL 324.20126a(4).

30.     The State of Michigan is authorized to bring a civil claim seeking recovery of damages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release or threat of release. MCL 324.20137(1)(c).

### Line 6B Failure and Discharges

31.     Defendants own or operate an extensive network of liquid transportation pipelines in the United States and Canada, including a liquid transmission pipeline known as Line 6B, a 293-mile long pipeline that runs between Griffith, Indiana, and Sarnia, Ontario, Canada.

32.     Line 6B is a "facility" within the meaning of Section 1001(9) of OPA, 33 U.S.C. § 2701(9).

8

33.     At all times relevant to this action, Line 6B was owned by Defendant
EELP, and the crude oil and liquid petroleum transportation and storage assets of EELP, in turn,
were owned by Defendant EEP, which is one of EELP's limited partners.

34.     At all times relevant to this action, Defendants EELP and EEP were
operators of Line 6B. EEP and EELP have no employees, officers or directors, and as a result,
they operate Line 6B through related Enbridge entities.

35.     At all times relevant to this Complaint, operation and management of Line
6B was performed by individuals employed by:

     a.     EP-Lakehead, which is the managing general partner of EELP,

     b.     EECI, which is the general partner of EEP,

     c.     EEM, which was established by EECI in 2002 to manage the business and
affairs of EEP,

     d.     EOSI and EPI, and

     e.     EESI, which is an American-based subsidiary of Enbridge (US) Inc.

36.     During a scheduled shutdown of Line 6B on the evening of July 25, 2010,
Line 6B ruptured near Marshall, Michigan. The section of Line 6B that ruptured is an "onshore
facility" within the meaning of Section 1001(24) of OPA, 33 U.S.C. § 2701(24).

37.     Enbridge's Control Center in Edmonton, Canada received numerous alarms
and other leak indicators at the time of the pipeline shutdown on July 25, 2010. Despite the
alarms and other leak indicators, Enbridge failed to perform an adequate investigation of the
causes of the alarms on July 25, 2010.

9

38.     Enbridge restarted Line 6B on two separate occasions on the morning of July 26, 2010, and the Edmonton Control Center received numerous additional alarms during those restarts.

39.     Despite the alarms and other leak indicators that Enbridge received on July 25, 2010 and July 26, 2010, Enbridge failed to recognize that Line 6B had ruptured until a third party contacted Enbridge and reported an oil spill -- more than 17 hours after the pipeline ruptured.  By that time, Enbridge had restarted the pipeline on two separate occasions, injecting large volumes of additional oil into the ruptured portion of the pipeline in an unsuccessful effort to restore pressure in Line 6B, and discharging additional oil into the environment from Line 6B.

40.     During both restarts of Line 6B, Enbridge violated its own operating procedures by continuing to pump oil into Line 6B for more than 10 minutes, despite the inability to restore pressure in Line 6B.  In addition, at and after the shutdown of Line 6B on July 25, 2010 and the restarts of Line 6B on July 26, 2010, Enbridge violated other of its own operating procedures, including an "MBS Leak Alarm" procedure, an "MBS Alarm-Analysis by MBS Support" procedure, a "Suspected Column Separation" procedure, a "Suspected Leak" procedure, a "Confirmed Leak" procedure, an "Abnormal Operating Condition Reporting" procedure and an "Emergency Notification" procedure.

41.     Enbridge also violated various federal pipeline safety and operation regulations, including:  (i) violation of 49 C.F.R. § 195.452(h)(4) by failing to timely remediate corrosion anomalies that had been detected in the section of Line 6B that ruptured; (ii) violation of 49 C.F.R. § 195.452(j)(2) by failing to conduct appropriate pipeline integrity assessments that properly consider and integrate information from both corrosion and cracking assessments;

(iii) violation of 49 C.F.R. § 195.401 by failing to correct conditions that could adversely affect safe operation of Line 6B, within a reasonable time of discovery of the sudden, abnormal pressure drop on Line 6B, and the receipt of Control Center alarms, including a low pressure alarm, a material imbalance alarm, and a "Unit Shutdown on Low Suction Pressure" alarm, and by continuing to operate Line 6B during the restarts on July 26, 2010, despite receiving multiple material imbalance alarms and despite the failure to build pressure in Line 6B; (iv) violation of 49 C.F.R. § 195.402(a) by failing to follow Enbridge's manual of written procedures for conducting normal operations and maintenance activities and for handling abnormal operating conditions and emergencies – including the failure to follow Enbridge's own "Suspected Leak" procedure, "Confirmed Leak" procedure, "Emergency Notification" procedure, "Suspected Column Separation" procedure, "MBS Leak Alarm" procedure and "MBS Alarm-Analysis by MBS Support" procedure.

42. As a result of the Line 6B rupture and Defendants' subsequent actions, Line 6B released at least 20,082 barrels of crude oil into the environment -- one of the largest inland oil spills in United States history.

43. The releases of oil from Line 6B on July 25, 2010 and July 26, 2010 (also referred to herein as "the Discharges") constitute "discharges" within the meaning of Section 1001(7) of OPA, 33 U.S.C. § 2701(7), an unlawful discharge prohibited under Section 3109 of the NREPA, MCL 324.3109, and a "release" of hazardous substances within the meaning of Section 20101(pp) of NREPA, MCL 324.20101(pp).

44. The Discharges included at least two types of oil -- Cold Lake Blend and Western Canadian Select -- both of which combine heavy crude derived from Canadian tar sands with a hydrocarbon diluent.

45. All of the material discharged from Line 6B on July 25, 2010 and July 26, 2010 is "oil" within the meaning of Section 1001(23) of OPA, 33 U.S.C. § 2701(23), and is a "hazardous substance" as defined in Section 20101(x) of the NREPA, MCL 324.20101(x).

46. After initially pooling in a marshy area about 700 feet north of Talmadge Creek, the Discharges from Line 6B flowed southward and entered Talmadge Creek, which carried the discharged oil downstream approximately 2 miles to the Kalamazoo River. Oil contamination then moved downstream in the Kalamazoo River at least as far as Morrow Lake, 38 miles downstream from the point where Talmadge Creek enters the Kalamazoo River.

47. Talmadge Creek, the Kalamazoo River and Morrow Lake are all "navigable waters" within the meaning of Section 1001(21) of OPA, 33 U.S.C. § 2701(21) and are all "waters of the state" as defined in Section 3101(z) of the NREPA, MCL 324.3101(z).

48. At the time of the Discharges, Talmadge Creek and the Kalamazoo River were in flood stage and outside their banks due to heavy rainfall during the previous days. As a result, crude oil covered both water bodies from bank to bank and entered into and affected their associated floodplains on both sides of the waterways.

49. As a result of the Discharges, a 39-mile section of the Kalamazoo River was closed to public use for approximately two years after the Discharges. Closure of portions of the Kalamazoo River resulted in lost human uses of the River, including lost recreational fishing,

12

swimming and boating uses, and lost cultural uses of the River by members of the Tribes.

50.     The Discharges resulted in the injury and death of wildlife near, and within, the impacted waterways and floodplains, and impacted surface water and sediment.

51.     As a result of the Discharges, extensive cleanup actions have been required to remove oil contamination from the environment, including Talmadge Creek, the Kalamazoo River, their adjoining shorelines, floodplains and wetlands adjacent to Talmadge Creek and the Kalamazoo River. In some instances, actions undertaken by Defendants to remove contaminated oil from the environment, also resulted in injury to, destruction of, or loss of natural resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, the State of Michigan and the Tribes.

52.     More than four years after the Discharges, some of the oil discharged from Line 6B remains in the environment, including sediments within the Kalamazoo River.

### FIRST CLAIM FOR RELIEF

#### Natural Resource Damages Under OPA

53.     Paragraphs 1 through 52 are re-alleged and incorporated herein by reference.

54.     As a result of the Discharges of oil from Line 6B on July 25, and July 26, 2010, and the extensive removal actions made necessary by the Discharges, there has been injury to, destruction of, loss of, and loss of use of, natural resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, the State of Michigan and the Tribes. Plaintiffs have sustained natural resource damages within the meaning of Section

1002(b)(2) (A) of OPA, 33 U.S.C. § 2702(b)(2)(A), as a result of the Discharges.

55.     Among other impacts, the Discharges resulted in closure of extensive sections of the Kalamazoo River, eliminating or severely curtailing recreational fishing, recreational boating and other human uses of the closed areas from July 25, 2010 until at least June 20, 2012. During the summer and fall of 2013, sections of the River were closed again for additional removal actions to recover more oil contamination from the River.

56.     Prior to the Discharges, the Nottawaseppi Huron Band of the Potawatomi had been planning for restoration of wild rice within the section of the Kalamazoo River that was impacted by the Discharges. The Discharges and subsequent closure of the River interfered with the ability to proceed with wild rice restoration.

57.     The Discharges, and removal actions required to clean up oil contamination from the Discharges, also resulted in injury to approximately 1,560 acres of in-stream habitat. Following completion of removal actions, affected in-stream habitat will require varying periods of time to return to pre-Discharge conditions, depending on factors such as the type of in-stream habitat, the nature of the removal actions performed in particular areas, and the extent of oiling. Some of the affected in-stream areas are expected to take as long as 15 years to recover from the Discharges.

58.     The Discharges, and removal actions required to clean up oil contamination from the Discharges, also resulted in injury to at least 2,887 acres of floodplain and wetland habitats. Following completion of removal actions, affected floodplain and wetland areas will require varying periods of time to return to pre-Discharge conditions, depending on factors such as the type of habitat, the nature of the removal actions performed in particular areas, and the

14

extent of oiling.   Some of the affected floodplain and wetland areas are expected to take more than 15 years to recover from the Discharges.

59.   Removal actions required to clean up oil contamination from the Discharges, including the construction of roads and staging areas, resulted in injury to approximately 185 acres of upland habitats.   Some of the affected upland areas are expected to require up to five more years to recover from the discharges.

60.   The Discharges, and response actions required to clean up oil contamination from the Discharges, also resulted in injury to biota, including birds, mammals, fish, and benthic invertebrates.

61.   In addition to birds that were captured, cleaned and released following the Discharges, at least 52 birds either were found dead or died during rehabilitation.   Approximately 140 more oiled birds were observed but not captured for rehabilitation.   Affected species included Canada goose, mallard, great blue heron and trumpeter swan.

62.   In addition to mammals that were captured, cleaned and released following the Discharges, at least 40 mammals were found dead or died during rehabilitation.   Affected species included muskrat, raccoon, mink and beaver.

63.   In addition to reptiles that were captured, cleaned and released following the Discharges, more than 100 reptiles were found dead or died during rehabilitation.   Nearly 4000 oiled turtles were captured, cleaned and released during 2010 and 2011.   In a number of instances, released turtles became recontaminated and were re-captured for further rehabilitation.

Affected species included common map turtle, snapping turtle, painted turtle, eastern spiny

15

softshell turtle and spotted turtle.

64.     Forty-two fish were found dead following the Discharges.  In addition, standardized surveys and other studies indicate that fish communities have been adversely affected by the Discharges.

65.     Standardized surveys and other studies indicate that benthic invertebrate communities were adversely affected by the Discharges.

66.     The United States Department of the Interior, acting through the United States Fish and Wildlife Service and Bureau of Indian Affairs, and the United States Department of Commerce, acting through the National Oceanic and Atmospheric Administration, in coordination with other natural resource trustees, including the Michigan Department of Natural Resources, the Michigan Department of Environmental Quality, the Michigan Attorney General, the Nottawaseppi Huron Band of the Potawatomi, and the Match-E-Be-Nash-She-Wish Band of the Pottawatomi Indians (the "Trustees"), initiated a natural resource damage assessment to determine the extent and anticipated duration of injuries and the value of injured resources and lost natural resource services.

67.     Federal natural resource trustees have incurred reasonable costs of assessing damages resulting from the Discharges, within the meaning of Section 1002(b)(2) of OPA, 33 U.S.C. § 2702(b)(2).  Defendants have reimbursed a portion of the assessment costs incurred by the United States and the State of Michigan.  However, the United States has incurred reasonable natural resource damage assessment costs that have not been reimbursed by

Defendants to date.  In addition, the Tribes have incurred at least $150,000 in reasonable natural

16

resource damage costs that have not been reimbursed by Enbridge to date.

68.     As owners and operators of Line 6B, Defendants are jointly and severally liable for paying all natural resource damages resulting from the Line 6B Discharges.

69.     The Line 6B pipeline rupture on July 25, 2010, and the Discharges from Line 6B on July 25, 2010 and each of the restarts of Line 6B on July 26, 2010 were proximately caused by the gross negligence, willful misconduct, or violation of applicable Federal safety, construction or operating regulations by Defendants, their agents or employees, or by persons with whom Defendants had contractual relationships. As a result, Defendants are liable for the full amount of damages to natural resources belong to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, the State of Michigan or the Tribes, without regard to liability limits in Section 1004(a) of OPA, 33 U.S.C. § 2704(a).

## SECOND CLAIM FOR RELIEF

### State of Michigan's Claim For
### Natural Resource Damages Under NREPA

70.     Paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.     The Discharges from Line 6B on July 25 and 26, 2010, constitute a "release" and "disposal" of a "hazardous substance" as those terms are defined in Section 20101(pp), 20101(m), and 20101(x) of the NREPA, respectively (MCL 324.20101(pp),

324.20101(m), 324.20101(x)) and an unlawful discharge under Section 3109(1) of the NREPA,

17

MCL 324.3109(1).

72.     The Discharges from Line 6B on July 25 and July 26, 2010 resulted in injury to, destruction of, or loss of natural resources appertaining to the State.

73.     As the owners and operators of Line 6B, Defendants are jointly and severally liable to the State for damages for the full value of injury to, destruction of, or loss of natural resources resulting from the release or disposal of hazardous substances, including the reasonable costs of assessing such injury, loss, or destruction. MCL 324.20126a.

74.     The State's claims for natural resource damages under Michigan law seek compensation for the damages and losses set forth in Paragraphs 55 and 57-66 of this Complaint, above. The State's claims for natural resource damages are brought in conjunction with the claims of the federal and Tribal trustees, and do not seek duplicative recovery of damages for the same release and natural resource. MCL 324.20126(a)(4).

## REQUEST FOR RELIEF

WHEREFORE, the United States of America respectfully requests that this Court:

A.     Enter judgment that Defendants are jointly and severally liable to Plaintiffs pursuant to Section 1002 of OPA, 33 U.S.C. § 2702, and MCL 324.20126a for damages for injuries to natural resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, the State of Michigan and the Tribes, including the Plaintiffs' reasonable costs of assessing the damages, without regard to any monetary limitations

on liability under OPA; and

   B.  Grant Plaintiffs such other relief as the Court deems just and proper.

       Respectfully submitted,

       FOR THE UNITED STATES:


       s/ John C. Cruden
       JOHN C. CRUDEN
       Assistant Attorney General
       Environment and Natural Resources Division
       U.S. Department of Justice


       s/ Steven J. Willey
       STEVEN J. WILLEY
       JOSEPH W.C. WARREN
       Environmental Enforcement Section
       Environment and Natural Resources Division
       U.S. Department of Justice
       P.O. Box 7611
       Washington, D.C.  20530
       (202) 514-2807
       steven.willey@usdoj.gov

PATRICK A. MILES, JR.
United States Attorney
Western District of Michigan


s/ Ryan D. Cobb
RYAN D. COBB
Assistant U.S. Attorney
330 Ionia Avenue, N.W.
Suite 501
Grand Rapids, MI  49503
616-456-2404
Ryan.Cobb@usdoj.gov

FOR THE STATE OF MICHIGAN:

BILL SCHUETTE
Attorney General of Michigan


 s/ Polly Synk
POLLY SYNK
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources,
        And Agriculture Division
P.O. Box 30755
Lansing, MI  48909
517-373-7540
SynkP@michigan.gov

FOR THE NOTAWASEPPI HURON BAND OF
THE POTAWATOMI


 s/ William J. Brooks
WILLIAM J. BROOKS
Chief Legal Counsel
William J. Brooks PLLC
PO Box 607
Manistee,  MI 49660
231-233-2559
bbrooks@nhbpi.com

FOR THE MATCH-E-BE-NASH-SHE-WISH
BAND OF THE POTTAWATOMI INDIANS


 s/ Ezekiel J.N. Fletcher
EZEKIEL J.N. FLETCHER
General Counsel
Fletcher, PLLC
Boji Tower
124 W. Allegan Street
Suite 1400
Lansing, MI 48933
zfletcher@fletcherlawpllc.com

23